UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Superior Edge, Inc.,

       Plaintiff,

v.                                                                                Civil No. 06-4165 (JNE/JJG)
                                                                              ORDER

Maricopa County Community College District,

       Defendant.

David A. Applebaum, Esq., and Todd A. Noteboom, Esq., Leonard, Street and Deinard, P.A., appeared for Plaintiff Superior Edge, Inc.[1]

Sean D. Garrison, Esq., Lewis & Roca LLP, appeared for Defendant Maricopa County Community College District.

Superior Edge, Inc., is the successor-in-interest to a course management system (Software) created by Anlon Systems, Inc. In 2000, Anlon Systems licensed the Software to Maricopa County Community College District (MCCCD) subject to the terms of a License and Maintenance Agreement (Agreement). Shortly before the Agreement's expiration in June 2003, Anlon Systems and MCCCD amended the Agreement. The Agreement, as amended, expired in June 2006. MCCCD continued to use the Software after the Agreement's expiration. Superior Edge then brought this action against MCCCD[2] asserting claims under federal and state law for copyright infringement, trademark infringement, deceptive trade practices, trade secret misappropriation, unjust enrichment, and breach of contract. The case is before the Court on

---

[1]     Carlson, Caspers, Vandenburgh & Lindquist, P.A., prepared and submitted Superior Edge's memorandum. Shortly before the motion hearing, Carlson, Caspers, Vandenburgh & Lindquist withdrew and Leonard, Street and Deinard appeared as substitute counsel. *See* D. Minn. LR 83.7(b).

[2]     The parties agreed to substitute at an appropriate time the MCCCD Governing Board as the proper defendant in this litigation.

1

MCCCD's motion to dismiss or transfer.  For the reasons set forth below, the Court transfers the case to the United States District Court for the District of Arizona.

MCCCD raises several arguments in its motion to dismiss.  The Court first addresses the argument that the Court lacks personal jurisdiction over MCCCD.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 127 S. Ct. 1184, 1191 (2007); *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 372 (8th Cir. 1990).

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must establish a prima facie case that the forum state has personal jurisdiction over the defendant.  *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 561 (8th Cir. 2003).  To decide whether the plaintiff has made the requisite showing, a court must view the evidence in the light most favorable to the plaintiff.  *Id.*  The court must determine whether the exercise of personal jurisdiction over the defendant complies with the state long-arm statute and, if so, whether it comports with due process.  *Id.*  Minnesota's long-arm statute, Minn. Stat. § 543.19 (2006), extends jurisdiction over defendants to the extent allowed by due process.  *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir.), *cert. denied*, 127 S. Ct. 217 (2006); *In re Minn. Asbestos Litig.*, 552 N.W.2d 242, 246 (Minn. 1996).  The Court therefore need only consider whether the requirements of due process are satisfied to resolve MCCCD's jurisdictional challenge.  *See Johnson*, 444 F.3d at 955; *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1389 & n.2 (8th Cir. 1991).

Due process allows a court to exercise personal jurisdiction over a nonresident defendant if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The defendant's contacts with the state must be such that the defendant "should

reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Unilateral activity by one who claims a relationship with the defendant does not satisfy the minimum contacts requirement. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Instead, the defendant must act so as to "purposefully avail itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* "Minimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit." *Pecoraro*, 340 F.3d at 562.

A court considers five factors in determining whether the exercise of personal jurisdiction over a defendant comports with due process. *Johnson*, 444 F.3d at 956; *Pecoraro*, 340 F.3d at 562. The factors are: (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the forum state's interest in the litigation; and (5) the convenience of the parties. *Johnson*, 444 F.3d at 956; *Pecoraro*, 340 F.3d at 562. The last two factors "carry less weight and are not dispositive." *Johnson*, 444 F.3d at 956; *see Pecoraro*, 340 F.3d at 562.

The third factor distinguishes general jurisdiction from specific jurisdiction. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996). The defendant's maintenance of continuous and systematic contacts with a state may subject it to the state's general jurisdiction, that is, the state may assert personal jurisdiction over the defendant in a suit that neither arises out of nor relates to the defendant's contacts with the state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 & n.9 (1984); *Morris v. Barkbuster, Inc.*, 923 F.2d 1277, 1280-81 (8th Cir. 1991). Specific jurisdiction refers to the state's assertion of personal jurisdiction over a defendant in a suit that arises out of or relates to the defendant's

contacts with the state. *Helicopteros*, 466 U.S. at 414 & n.8; *Morris*, 923 F.2d at 1280. In this case, Superior Edge asserts that MCCCD is subject to specific jurisdiction. In support, Superior Edge emphasizes the Agreement's choice-of-law clause: "Most importantly, the present lawsuit arises out of a software License Agreement that is expressly controlled by Minnesota law." Superior Edge also relies on visits to Anlon Systems' office in Minnesota by MCCCD personnel; telephone calls from MCCCD to Superior Edge for technical support; an internet hosting agreement that MCCCD had with a Minnesota-based company; and the Agreement itself.

A nonresident defendant's contract with a forum resident does not necessarily confer jurisdiction over the nonresident defendant in the forum:

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests or on "conceptualistic . . . theories of the place of contracting or of performance." Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79 (1985) (citations omitted); *see Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 313 (8th Cir. 1982) ("Merely entering into a contract with a forum resident does not provide the requisite contacts between a (nonresident) defendant and the forum state."). In *Burger King*, the Supreme Court upheld the exercise of personal jurisdiction by a Florida court over a Michigan resident who had entered into a 20-year franchise agreement with a Florida corporation. 471 U.S. at 487. Although the Michigan resident had no physical contacts with Florida apart from his associate's brief training course in Miami, the contract had a substantial connection with Florida. *Id.* at 479. The Michigan resident

4

negotiated with a Florida corporation to purchase a franchise and obtain the benefits of affiliation with a nationwide organization. *Id.* at 479-80. The negotiations yielded a 20-year franchise agreement that envisioned "continuing and wide-reaching contacts" with the corporation in Florida, including "long-term and exacting regulation" of the franchise from the corporation's Miami headquarters. *Id.* at 480. The franchise agreement contained a Florida choice-of-law clause. *Id.* at 481. Insufficient by itself to confer jurisdiction, the choice-of-law clause, combined with the 20-year relationship established between the Michigan resident and the Florida corporation, "reinforced [the Michigan resident's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482; *see Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1434 (8th Cir. 1995) ("The choice-of-law clause, like the mail and telephone contacts, is insufficient standing alone to confer jurisdiction. However, when these contacts are combined with the other factors, they become wholly relevant and significant.").

    In this case, the record reveals that MCCCD first encountered Anlon Systems at a conference in Long Beach, California, in October 1999. There, Ronald Bleed, MCCCD's Vice Chancellor of Information Technology Services, met Anlon Systems' co-founders. They briefly discussed MCCCD's desire for a new course management system. Anlon Systems later made several visits to Arizona to promote its product to MCCCD. In June 2000, Dr. Angela Ambrosia, Faculty Chair for Web Technology and Innovation for one of MCCCD's community colleges, traveled to Anlon Systems' office in Mankato, Minnesota, to determine whether Anlon Systems could provide a viable course management system. Over the course of two days, Dr. Ambrosia discussed with Anlon Systems' programmers the type of software sought by MCCCD and Anlon

Systems' willingness to tailor the software for MCCCD. A few weeks later, MCCCD and Anlon Systems executed the Agreement.

The Agreement included a three-year term, starting on June 28, 2000. The Agreement states: "On payment of the license fee . . . [MCCCD] shall have a perpetual license to use the Software and any upgrades or customizations, at no additional cost." The Agreement imposed several obligations on Anlon Systems, including: (1) provide the Software to MCCCD; (2) provide a site license to MCCCD to use the Software; (3) integrate the Software with MCCCD's Student Information System; (4) assist one of MCCCD's community colleges in the migration of existing courses to the Software; (5) place the source code of the Software in escrow; (6) provide on-site training to MCCCD; (7) provide telephonic support to MCCCD; (8) give MCCCD access to future versions of the Software; and (9) give MCCCD the "first choice of refusal for beta testing new software releases." In return, MCCCD agreed to provide to Anlon Systems: (1) a license fee; (2) an annual maintenance fee; (3) payment for additional services; (4) acknowledgement during the Agreement's term that the Software is the online administration tool of MCCCD; (5) up to ten references annually by Bleed; (6) contact persons related to specific aspects of the Software; (7) a commitment to provide training on the Software at the MCCCD's community colleges; and (8) a commitment to provide feedback to Anlon Systems through the contact persons. The Agreement provided that its "terms and conditions . . . shall be interpreted, construed and enforced according to the laws of the State of Minnesota, to the extent permitted by law."[3]

Dr. Ambrosia became MCCCD's primary contact with Anlon Systems and had frequent telephone calls with Anlon Systems. In her affidavit, she states that Anlon Systems personnel

---

[3] Superior Edge mischaracterizes the choice-of-law clause as a "forum selection clause." *See Dunne v. Libbra*, 330 F.3d 1062, 1063-64 (8th Cir. 2003).

6

"regularly came down to Arizona to meet with [MCCCD] to work on development issues, software malfunctions and training of faculty and staff," and that all training took place in Arizona.

More than one year after the Agreement's execution, Bleed came to Minnesota for reasons unrelated to the Agreement. He came to attend a conference in Minneapolis. Due to Anlon Systems' proximity to Minneapolis, Bleed arranged to visit Anlon Systems' office in Mankato. He spent a couple of hours at Anlon Systems and returned to Minneapolis for the rest of the conference. Bleed described the visit as "primarily social" and intended the "foster [the] relationship" between MCCCD and Anlon Systems. Bleed did not negotiate any contracts or engage in any other substantive business during the visit.

As noted above, MCCCD and Anlon Systems executed an amendment to the Agreement in June 2003. As amended, the Agreement contained a three-year term, starting on June 19, 2003. Anlon Systems agreed to provide to MCCCD a site license, standard maintenance, and support via telephone and e-mail. MCCCD agreed to pay Anlon Systems an annual license fee, to provide Anlon Systems with contact persons capable of receiving support provided by Anlon Systems, to provide continual training on the Software at the community colleges, and to provide feedback on the software to Anlon Systems. MCCCD also consented to Anlon Systems' assignment of the Agreement to Superior Edge. Superior Edge purchased virtually all assets of Anlon Systems in July 2003.

MCCCD and Superior Edge did not agree to extend the agreement beyond June 2006. From 2003 to 2006, MCCCD made 245 telephone calls to Superior Edge for technical support:

99 in 2003; 96 in 2004; 43 in 2005; and 7 in 2006.[4] MCCCD continued to use the Software after the Agreement's expiration. Superior Edge then brought this action.

Superior Edge asserts that the facts supporting the exercise of personal jurisdiction over MCCCD are "stronger" than those found sufficient in *Wessels*. In that case, the plaintiff was an investment bank in Minneapolis, and the defendant was a Delaware corporation whose principal place of business was in Nashville, Tennessee. 65 F.3d at 1429-30. John Pappajohn, a director and shareholder of the defendant, and Michael Kessler, a partner at the investment bank, discussed engaging Kessler's expertise on a potential merger that the defendant was considering. *Id.* at 1430. Negotiations between Kessler and Oren Embry, the president of the defendant and its board of directors, followed. *Id.* Ultimately, the plaintiff and the defendant entered into a contract that contained a Minnesota choice-of-law clause. *Id.* The plaintiff agreed to conduct a due diligence investigation of the defendant; to assist and advise the defendant as to the pricing, form, and structure of the merger; to render a "fairness opinion"; to present the conclusion to the defendant's board; and to provide other services as requested by the defendant. *Id.* In return, the defendant agreed to pay the plaintiff a retainer fee and a financial advisory fee. *Id.* The defendant also agreed to indemnify and reimburse the plaintiff for certain expenses. *Id.* The plaintiff performed its contractual obligations and submitted an invoice to the defendant, but the defendant did not pay. *Id.* While the bill was outstanding, Embry called Keller seeking suggestions of other firms that provide asset appraisals. *Id.* Pappajohn also visited Kessler in Minnesota twice to discuss the outstanding bill. *Id.* The plaintiff ultimately brought suit in this District. *Id.* at 1429-30. Characterizing the issue as "close," the district court denied the defendant's motion to dismiss for lack of personal jurisdiction. *Id.* at 1431. The Eighth Circuit

---

[4] In its memorandum, Superior Edge describes the number of calls for technical support made by MCCCD as "over 250 in the last three years alone."

affirmed. *Id.* The court of appeals regarded the choice-of-law clause and contacts by mail and telephone "wholly relevant and significant" when combined with other factors:

> Pappajohn procured the expertise of an investment banking firm for assistance with financial problems that were facing his corporation. The record evidences that [the defendant] accepted the director's efforts and actively pursued a business relationship with [the plaintiff] whereby a contract was subsequently consummated. The contract was performed by [the plaintiff] virtually in its entirety in Minnesota. There were substantial mail and phone correspondence between [the defendant] and [the plaintiff] and two visits by Pappajohn to Minnesota to discuss obligations under the contract. Taken as a whole, the nature, quantity, and quality of the contacts and the relationship of the contacts to the cause of action sufficiently meet the due process requirements of personal jurisdiction.

*Id.* at 1434; *see St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 592 (8th Cir. 2001) ("In *Wessels*, we held that a nonresident who aggressively pursues a business relationship with a Minnesota resident has sufficient minimum contacts with Minnesota to satisfy the due process clause.").

In contrast, the record here reveals that Anlon Systems actively pursued MCCCD after their initial encounter at the conference in Long Beach, California, by making several visits to MCCCD to promote the Software. Dr. Ambrosia's sole visit to Anlon Systems preceded the Agreement's execution and thus involved at most preliminary negotiations. *See St. Jude Med.*, 250 F.3d at 592 ("Because the nonresident's connection with Minnesota was limited to preliminary negotiations, we found its contacts insufficient to establish jurisdiction in Minnesota."); *Sybaritic, Inc. v. Interport Int'l, Inc.*, 957 F.2d 522, 525 (8th Cir. 1992). The Agreement contemplated the Software's use in Arizona by MCCCD and its colleges. Anlon Systems performed a substantial portion of the Agreement in Arizona through regular visits to MCCCD for training and development of the Software. Bleed's brief visit to Anlon Systems was just that; he did not engage in substantive negotiations. The Agreement's contemplation of the Software's use in Arizona and Anlon Systems' performance of a substantial portion of the

9

Agreement in Arizona diminish the significance of the Agreement's choice-of-law clause and the telephone contacts between MCCCD and Anlon Systems or Superior Edge. *See Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002) ("Contact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause."); *Wessels*, 65 F.3d at 1434. The relationship between MCCCD's contacts with Minnesota and this action is largely attenuated. Superior Edge makes no claim with respect to MCCCD's contract with another Minnesota-based company for internet hosting services, the visits to Minnesota by Dr. Ambrosia or Bleed, or MCCCD's telephone calls to Minnesota. Its claims rely on MCCCD's use of the Software after the Agreement's expiration. Accordingly, the Court is not persuaded by Superior Edge's reliance on *Wessels*.

Superior Edge also argues that the exercise of personal jurisdiction over MCCCD is justified under *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, Shirley Jones claimed that she had been libeled in an article published in the *National Enquirer*. 465 U.S. at 784-85. She brought suit in California Superior Court against two Florida residents who wrote and edited the article. *Id.* The defendants moved to quash the service of process for lack of personal jurisdiction. *Id.* The superior court granted the motion, and the California Court of Appeal reversed. *Id.* at 785. The court of appeal concluded that jurisdiction existed because the defendants intended to, and did, cause tortious injury to the Jones in California. *Id.* at 787. The Supreme Court affirmed:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

10

> . . . .
>
> . . . [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*Id.* at 788-90 (citations and footnote omitted).

The Eighth Circuit has applied *Calder* in five cases. *Oriental Trading Co. v. Firetti*, 236 F.3d 938 (8th Cir. 2001); *Finley v. River N. Records, Inc.*, 148 F.3d 913 (8th Cir. 1998); *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993); *Hicklin Engineering, Inc. v. Aidco, Inc.*, 959 F.2d 738 (8th Cir. 1992) (per curiam); *Dakota Indus.*, 946 F.2d 1384. In each case, the Eighth Circuit focused on whether the defendant aimed its conduct at the forum state and whether that conduct was felt there. *See Firetti*, 236 F.3d at 943 ("By purposely directing their fraudulent communications at residents of Nebraska, the defendants should have realized that the brunt of the harm would be felt there, and they should have reasonably anticipated being haled into court there." (citation omitted)); *Finley*, 148 F.3d at 916 ("This is fraudulent conduct, intended to induce commercial activity within the forum state."); *Grossman*, 991 F.2d at 1387-88 ("Here, the 'focal point' of the alleged wrongdoing and harm occurred in Canada . . . . Although it can be argued that the effects of the harm ultimately occurred in Minnesota, under the circumstances, the accounting firms could not reasonably anticipate 'being haled' into court there."); *Hicklin Engineering*, 959 F.2d at 739 ("None of the correspondence, however, was published in Iowa. Nor can we say that Aidco's actions were targeted to have an effect in Iowa."); *Dakota Indus.*, 946 F.2d at 1391 ("The fact that some of the 'passing off' occurred in South Dakota, along with the fact that Industries' principal place of business is in South Dakota,

11

demonstrates that Sportswear's actions were uniquely aimed at the forum state and that the 'brunt' of the injury would be felt there, as required by *Calder*."); *see Crystal Group, Inc. v. Boston Commc'ns Group, Inc.*, No. C99-152, 2000 WL 34031499, at *6 (N.D. Iowa Apr. 26, 2000) ("These Eighth Circuit decisions coupled with the decisions of the other circuits convince this Court that a 'narrow construction' of the 'effects test' best describes the law in the Eighth Circuit.").

Superior Edge argues that MCCCD's use of the Software after the Agreement's expiration infringes on Superior Edge's copyrights. According to Superior Edge, the alleged infringement constitutes conduct uniquely aimed at Minnesota for purposes of *Calder*. Although *Calder* is sometimes characterized in shorthand as the "effects" test, "more than mere effects" supported the Supreme Court's holding in *Calder*. *Hicklin*, 959 F.2d at 739. MCCCD is using the Software in Arizona. Its conduct is not intended to induce commercial activity in Minnesota. MCCCD's knowledge that Superior Edge, a Minnesota corporation, would feel the injury arising from the alleged infringement is not sufficient to invoke *Calder*.

Viewing the record in the light most favorable to Superior Edge, the Court concludes that Superior Edge has not established a prima facie case of personal jurisdiction over MCCCD in Minnesota. The gravamen of the Complaint, namely the use in Arizona of the Software licensed by a Minnesota company after the Agreement's expiration, is not sufficient under traditional notions of fair play and substantial justice to justify compelling MCCCD to respond to Superior Edge's allegations in Minnesota.

Where, as here, a district court lacks personal jurisdiction over the defendant, the court may dismiss the action or transfer it to a district where it could have been brought. 28 U.S.C.

§ 1631 (2000); *Johnson*, 444 F.3d at 954 n.2.  In the interest of justice, the Court transfers this action to the United States District Court for the District of Arizona.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. MCCCD's motion to dismiss or transfer [Docket No. 6] is GRANTED.

2. The Clerk of Court shall TRANSFER this action to the United States District Court for the District of Arizona.

Dated:  April 5, 2007

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge